PRESCOTT HALL BUTLER, AS ANCILLARY ADMINISTRATOR OF THE GOODS, CHATTELS AND CREDITS WHICH WERE OF BOMANJEE BYRAMJEE COLAH, DECEASED, RESPONDENT, *v.* NATHANIEL JARVIS, JR., INDIVIDUALLY AND AS COMMITTEE OF THE ESTATE OF BOMANJEE BYRAMJEE COLAH, A LUNATIC, APPELLANT.

*A committee of the estate of a lunatic can, after the death of the lunatic, be compelled to account to his administrator in the Supreme Court, although such committee was appointed by the Court of Common Pleas — sections 2343, 2320 of the Code of Civil Procedure, construed — when a committee will be charged with the amount unpaid on mortgages in which he has invested the moneys of the estate — when he should be charged with simple interest only — in an action brought in the Supreme Court the transactions of the committee prior to an accounting had in the Common Pleas, during the lunatic's life, cannot be investigated.*

Upon an appeal from a judgment, recovered by the plaintiff as the ancillary administrator of the goods, etc., of Bomanjee Byramjee Colah, deceased, in an action brought to compel the defendant to render an account of his proceedings as the committee of the said deceased, and deliver over to the plaintiff the amount found to be due upon the settlement of said accounts, it appeared that the decedent died on the 18th day of January, 1882, the defendant having been appointed, in 1870, the committee of his estate by the Court of Common Pleas of the city of New York.

Upon the hearing of the appeal the defendant objected that the proceedings for the settlement of the defendant's accounts and the delivery of the estate over to the plaintiff, should have been taken in the Court of Common Pleas in which the appointment of the defendant was made.

*Held,* that the objection was not well taken. (VAN BRUNT, P. J., dissenting.)

That, by section 1 of 2 Revised Statutes, 52, the entire authority for the care and custody of persons of unsound mind, and of their real and personal estate, was vested in the chancellor, as chancellor, and, as such, was made a part of the jurisdiction of the Court of Chancery of this State, and continued to be so until the adoption of the Constitution of 1846.

That, by section 217 of the Code of Civil Procedure, the jurisdiction of the Court of Chancery was vested in the Supreme Court of this State.

That this jurisdiction was general and unqualified, except so far only as it might be limited by the exigencies to be provided for, through the authority of the court, and has not been reduced, or in any manner taken away, except so far as like authority has, by the legislature, been vested to a defined extent in other tribunals.

That sections 2321 2342 and 2343 of the Code of Civil Procedure, which include all the exclusive authority vested in a Superior City Court or a County Court,

did not comprehend an action for the final accounting by the defendant after the decease of the lunatic.

That as neither of these sections cited vested either of such courts with exclusive jurisdiction over the estate of a lunatic after his decease, and it has been provided by section 2344 of the Code of Civil Procedure that in the event of the death of the lunatic the power of the committee shall cease, and " the property of the decedent must be administered and disposed of as if a committee had not been appointed," the committee held the estate as so much property to be accounted for and passed over to the administrator of the deceased person.

That in that respect he stood in the same relation to the personal representative as any other individual would who had the possession of the property of a deceased person, holding it subject to the obligation to pass it over to the personal representative, and was liable to account to such personal representative in the ordinary course of legal proceedings taken for that purpose.

That the right of action for that purpose vested in the personal representative, to be prosecuted and enforced the same as any other right of action accruing to him under and by virtue of his appointment.

That the jurisdiction over such an action is within the unabridged and general delegation of authority, made to the Supreme Court as the successor of the Court of Chancery, and also within the power conferred by the general statutes of the State, vesting the Supreme Court with the care and custody of lunatics and persons of unsound mind, and of their real and personal estate.

It further appeared that on the 24th day of January, 1884, on which day this action was commenced, proceedings had already been instituted by the plaintiff, in the said Court of Common Pleas, for the settlement of the accounts of the defendant, and were then pending therein, but thereafter, upon the application of the plaintiff, he was, before the trial of this action, permitted to discontinue the proceeding.

*Held*, that after such discontinuance the proceedings in the Court of Common Pleas were no obstacle to the present action.

That, under section 522 of the Code of Civil Procedure, the plaintiff had the right to prove in regard to this defense in the answer without pleading it, any matter in avoidance, as this clearly was.

Upon the trial of this action a judgment was entered adjudging that there was due from the defendant, on account of property received by him belonging to the intestate, the sum of $73,491.25, which included and was based upon a settlement of his accounts from October 31, 1874, to the time of the completion of the trial. By this judgment the defendant was charged with the amount uncollected upon a mortgage taken by him, on July 28, 1870, for $6,000. This money had been loaned to one Squires, a friend of the defendant, and no part of the principal or interest was paid upon it, except the sum of $630 for interest, on November 1, 1872. Thereafter, under a decree of foreclosure, entered on June 22, 1880, adjudging that $9,290.83 was then unpaid on the mortgage, the property was sold and purchased for the sum of $8,000 by Albert Langdon, who afterwards conveyed it to the defendant, individually, who has held the title to the property

since that time. No proceedings were taken to collect the deficiency during the life of Squires, who soon afterwards died insolvent, or from his mother, to whom his personal estate passed.

*Held,* that the court properly disallowed a charge made by the defendant against the estate for the cost of the foreclosure, as well as for taxes paid, and refused to deduct the amount unpaid upon the mortgage from the moneys which had passed into the hands of the defendant as the committee of this lunatic.

Another mortgage was made on March 15, 1871, by one Peters to the defendant to secure a loan of $20,000 upon a leasehold estate of the mortgagor, in premises situated in the city of New York, for the period of twenty years, with the privilege of certain renewals. Thereafter the said leasehold estate of the mortgagor was divested by his failure to pay the rent reserved in the lease, leaving a balance of the loan, amounting to the sum of $7,333.34, uncollected and unpaid, no part of which has been paid by the mortgagor.

*Held,* that the loan of this sum of money upon this security was entirely inexcusable, as the defendant, in making loans of the money for the lunatic, was bound to make them upon the real estate itself, which was subject to no preceding incumbrance, and which was of a value sufficient to secure the return of the money beyond doubt or peradventure.

That he failed to do this as the loan was not made upon the real estate, but was made upon the leasehold interest, subject at any time to be divested by the failure of the tenant, who was the mortgagor, to pay the rent reserved in the lease.

That he was liable to reimburse this money to the estate.

*King* v. *Talbott* (40 N. Y., 76) followed.

It appeared, by the proceedings upon the trial, that a reference was made in the Court of Common Pleas, on the petition of the defendant, for the adjustment of his accounts and a determination of his right to extra compensation for the services which had been performed by him on behalf of the lunatic prior to the latter part of the year 1874; that the referee reported the state of the defendant's accounts, showing money then in his hands, amounting to the sum of $20,248.38, and securities to the amount of $32,833.34; this report was confirmed by an order of the Court of Common Pleas, with an addition of $150 to that amount.

*Held,* that a claim, made by the defendant, that he was thereby relieved from all liability for the uncollected indebtedness on each of these mortgages, could not be supported, as no question arose in those proceedings as to the sufficiency of these mortgages, as security for the indebtedness mentioned therein, or as to the propriety of making either of the loans.

It appeared by the accounts of the defendant, filed in the proceedings in the Court of Common Pleas, that he had appropriated towards the payments of his commissions, up to the latter part of the year 1874, the sum of $6,842.46. The referee recommended that he should be allowed "a sum which, including his commissions, would make the full sum of five thousand dollars." This report was, in this respect, confirmed by the order of the Court of Common Pleas.

Upon the trial of this action the court charged him with the balance of this account, after deducting $5,000, reported in his favor by the referee, and allowed to him by the Court of Common Pleas.

*Held*, that, as he had received that sum, according to his own evidence, he was not at liberty to charge it against the funds in his hands, and that the court in this action properly declined to take the said sum of $5,000 from the funds remaining in his hands.   (VAN BRUNT, P. J., dissenting.)

That an objection taken to any investigation being made in this action as to transactions of the committee before the order made, in the year 1874, upon the said referee's report, was well taken, for the reason that, to the extent to which the proceedings then went, they were, under the provisions of the sections of the Code of Civil Procedure before cited, within the exclusive jurisdiction of the Court of Common Pleas, and its order and determination were in the nature of a final judgment passing upon the accounts and adjusting the amounts of cash and securities then in the hands of the defendant.

*Tharp* v. *Tharp* (3 Merivale, 510); *Blake* v. *Pegram* (101 Mass., 592); *Douglas's Appeal* (82 Penn., 169) distinguished.

That while this objection should have been sustained, yet inasmuch as it was finally held that the order made in 1874 closing the accounts, as they were found to be established at that time, was binding upon the plaintiff, and that the defendant was liable for no more than the money and securities found in his hands at that time, he was not prejudiced by the ruling of the court allowing the preceding accounts to be again investigated, or by the circumstance that the principal of the estate itself had, in four years, been reduced from over $134,000 to the sum of $53,081.73.

In arriving at the amount for which judgment was entered, the defendant was charged the legal rates of interest, added to the principal at the close of each year after the year 1874, upon the ground that he had omitted to invest the funds in securities, as was directed by an order of the Court of Common Pleas on the 13th day of January, 1871, by which order he was permitted only to loan the moneys of the estate upon bonds and mortgages on real estate in the city of New York, or the bonds of the United States, or of the State of New York, or the stocks or bonds of the city and county of New York.

It appeared that the funds, except what were invested in the two mortgages above mentioned, were deposited in the hands of Vermilye & Co., who allowed but a small rate of interest upon them, and were left in their hands in this manner, without investment, up to the time of the decease of the lunatic.

*Held*, that, as it was not shown in the course of the trial that there was any willful misappropriation of the moneys of the estate, or willful neglect to invest them as it was the duty of the defendant to do, and as it was evident from the judgment herein, that if it is collected, the estate has not, and will not lose or be deprived of any part of the principal to which it is entitled, the court should only have charged the defendant with simple interest upon the moneys from time to time annually remaining in his hands, at the rate of seven per cent to January 1, 1880, and at the rate of six per cent from that time to the time of the recovery of the judgment.

*Thorn* v. *Garner* (42 Hun, 515); *Livermore* v. *Wakeman* (25 id., 341); *McKim* v. *Blake* (139 Mass., 593); *Wilmerding* v. *McKesson* (103 N. Y., 329); *Matter of Thurston* (57 Wis., 104); *O'Brien* v. *Young* (95 N. Y., 428); *Ball* v. *Biddlecom* (Id., 651) followed.

APPEAL from an order denying a motion for the resettlement of the defendant's case on appeal, entered in the office of the clerk of the city and county of Albany, on March 17, 1887, and from a judgment recovered on a trial before Special Term, and entered in the office of the clerk of the city and county of New York, on December 13, 1886.

*G. W. Cotterill* and *A. J. Vanderpoel,* for the appellant.

*Joseph H. Choate,* for the respondent.

DANIELS, J. :

The action has been brought by the plaintiff, as the ancillary administrator of the goods, chattels and credits, which were of Bomanjee Byramjee Colah, deceased. He died at Bombay on the 18th of January, 1882. The defendant was appointed the committee of his estate by the Court of Common Pleas of the city of New York, in the year 1870, and in support of the appeals, it has been objected that the proceeding for the settlement of the defendant's accounts and the delivery of the estate over to the plaintiff, should have been taken in the Court of Common Pleas, in which the appointment was made. A strenuous endeavor has been made to support this objection, by a reference to the jurisdiction of the chancellor over idiots and lunatics, as that was exercised in the kingdom of Great Britain. The authority of the chancellor to initiate the proceedings was derived from a special warrant, issued to him by the king, who was invested with the authority of caring for and protecting persons of unsound mind. But the authority delegated by the warrant of the · executive appears to have extended no farther than the inclusion of the power to select and appoint a suitable person to have the care and custody of the lunatic, and the administration of his estate. After that was done, and the person appointed had entered upon the duties of his office, then the chancellor, as chancellor, had jurisdiction over the committee, and control and direction in the administration of the estate. This point was examined in *Ex parte Fitzgerald* (2 Sch. & L., 432), where the conclusion was reached by the chancellor that, " The superintendence of the conduct of the committee in the management, both of the property and the person, originates

in the authority of the court itself, as the court from which the commission inquiring of the lunacy issues, and into which the inquisition is returned, and which makes the grant founded on the inquisition." The warrant of authority, it was held, included no more than that of selecting and appointing the committee. After that, the jurisdiction over him and his control and management of the estate appertained to the court, as a court, and could be exercised as part of its own jurisdiction. This subject was considered in 2 Story's Equity Jurisprudence, section 1364, where the result of the authorities was stated to be, that, " After the custody is so granted and maintenance is assigned, the chancellor acts in other matters, relative to lunatics, at least, not under the warrant by the sign-manual, but in virtue of his general power as holding the great seal and keeper of the king's conscience." And this view also has the sanction, to a limited extent, certainly, of the case of *Grimstone* (Ambler, 707). And the principle in this manner established, became a part of the laws of this State, vesting the like authority in the Court of Chancery, and continued to the adoption of the Constitution of 1846, when, by section 3 of article 6, it was declared that the Supreme Court should have general jurisdiction in law and equity, which was sufficiently broad to include this class of cases.

But if this conclusion should not be deemed to be so well established as to require the dismissal of this objection, its correctness seems to follow from the subsequent action of the legislature of the State. For, as early as the year 1821, this power was vested in the chancellor of the State ; and, by the Revised Statutes in 1830, it was declared that he should have the care and custody of all idiots, lunatics, persons of unsound mind, and persons who should be incapable of conducting their own affairs in consequence of habitual drunkenness, and of their real and personal estate, so that the same should not be wasted or destroyed. (1 R. S. [2d ed.] 814, § 1.) This legislation was so broad as to vest the entire authority to be exercised in the chancellor, as chancellor, and as such it was made a part of the jurisdiction of the Court of Chancery of the State, and it continued to be so until the adoption of the Constitution in 1846. And by section 217 of the Code of Civil Procedure, following other similar legislation upon the abrogation of the Court of

Chancery, its jurisdiction was vested in the Supreme Court of the State. This jurisdiction was general and unqualified, except so far as it might be limited only by the exigencies to be provided for through the authority of the court; and it has not been reduced or, in any manner, taken away, except so far as like authority has, by the legislature, been vested to a defined extent in other tribunals. For this purpose it has been provided by section 2320 of the Code of Civil Procedure that, " where a Superior City Court or a County Court, or both, have jurisdiction of those matters concurrent with that of the Supreme Court, the jurisdiction of the court first exercising it, as prescribed in this title, is exclusive of that of the others, with respect to any matter within its jurisdiction, for which provision is made in this title." And provision has been made in this title conferring such jurisdiction over the property of the incompetent person, so far as to preserve it from waste or destruction, and to provide, out of its proceeds, for the payment of his debts, and for the safe-keeping, maintenance and education of the incompetent person and his family. And when he may fail to file the annual inventory required from him there, he may be compelled to do so by the action of such court; and, in case of a restoration of the competency of the person whose care is committed to the appointee of the court, it may require his property to be restored to him, so far as it remains in the hands of the committee. These provisions are contained in sections 2321, 2342 and 2343 of the Code of Civil Procedure, and seem to include all the exclusive authority vested in a Superior City Court or a County Court; and they fail to comprehend an action for the final accounting of the defendant after the decease of the lunatic; and intrench no farther upon the general authority delegated to the Supreme Court as a court of equity, or acting under the statute, than to include this management, control and administration.

Neither section, nor anything contained in them, has vested either of these other courts with exclusive jurisdiction over the estate of the lunatic after the fact of his decease, but it has been further provided by section 2344 of the Code of Civil Procedure, in that event, that the power of the committee shall cease " and the property of the decedent must be administered and disposed of as if a committee had not been appointed." From that time he ceases to be the

committee of the estate previously committed to his charge, and holds the estate as so much property to be accounted for and passed over to the administrator of the deceased person. In that respect he stands in the same relation to the personal representative as any other individual would who has the possession of the property of the deceased person holding it subject only to the obligation to pass it over to the personal representative, and he is liable to account to him in the ordinary course of legal proceedings taken for that object. A right of action for that purpose vests in the personal representative, to be prosecuted and enforced the same as any other right of action accruing to him under and by virtue of his appointment. The appropriate remedy to enforce this right is an action for an accounting, the same as it would be if he had in any other way lawfully acquired the estate and property of the deceased person. And the jurisdiction over such an action is within the unabridged and general delegation of authority made to the Supreme Court as the successor of the Court of Chancery, and, also, within the general statutes of the State, vesting it with the care and custody of lunatics and persons of unsound mind, and of their real and personal estates. The objection that this court had no jurisdiction of the action was accordingly disposed of, as it should be, on the trial at the Special Term. A further defense which has been presented by the answer of the defendant consists in the allegation that a proceeding had already been set on foot and was pending in the Court of Common Pleas, in the city of New York, for the settlement of the accounts of the defendant at the time when this action was commenced. Such a proceeding was there instituted on the petition of the plaintiff, and an order directing a reference for the hearing of the case had been made, but on the 24th of January, 1884, which was the day on which this suit was commenced, an order was entered in the Court of Common Pleas under the direction of one of its justices, and on motion of the plaintiff, discontinuing the proceeding upon the payment of the costs thereof to the defendant. And this order was served upon him on the following day and an offer made for the payment of such costs. A motion was afterwards made on notice to the plaintiff to vacate this order, and it was vacated on the 8th of February, 1884. An appeal was taken from the last order to the General Term where it was

affirmed, and from that affirmance an appeal was taken to the Court of Appeals, where the appeal was dismissed, without a hearing of the merits. The plaintiff then applied on notice for leave to discontinue the proceeding in the Court of Common Pleas, but the application was denied, and the order of denial affirmed by the General Term of that court. The case was then taken again to the Court of Appeals, where it was heard upon its merits, and the general proposition enunciated that he had the right to discontinue where no substantial right of any other person had accrued in the proceeding, and injustice would not be done by permitting the discontinuance. (*Matter of Butler*, 101 N. Y., 307.)

The orders were consequently reversed and the discontinuance of the proceeding was permitted. This effectually put the proceeding in the Court of Common Pleas from that time out of the way of the present action, which was afterwards tried. And, under section 522 of the Code of Civil Procedure, the plaintiff had the right to answer this defense without pleading it, by any matter of avoidance as this clearly was. This part of the defense consequently failed to form any portion of the action at the time when the trial took place before the court. All that was then pending between the parties was this suit, over which the court had jurisdiction and in which it declared and determined the rights and obligations of the parties, so far as they were then understood.

The trial resulted in the conclusion that there was due from the defendant, on account of property received by him belonging to the intestate, the sum of $73,491.25. This included and proceeded upon the settlement of his accounts from the 31st of October, 1874, to the time of the completion of the trial. In arriving at this conclusion the defendant was charged with the amount uncollected upon a mortgage taken by him for the sum of $6,000 on the 28th of July, 1870. This mortgage was upon thirty-two lots of ground, upon which a wooden dwelling-house, two or three stories in heighth, was situated in Flushing, Long Island. The facts upon which the court declined to deduct the amount of this mortgage from the moneys of the intestate in the hands of the defendant, were obtained from him in the course of his examination as a witness. The money was loaned to Theodore M. Squires, a friend of the defendant, and no part of the principal or interest was paid upon it, except the sum

of $630 for interest on the 1st of November, 1872. After that, so far as the evidence indicates the fact to be, it received no attention until proceedings for the foreclosure of the mortgage were taken, and they resulted in a decree on the 22d of June, 1880. The amount then unpaid on the mortgage was the sum of $9,290.83. The property at the foreclosure sale was purchased for the sum of $8,000 by the defendant in the name of Albert Langdon, who afterwards conveyed it to him individually, and he has held the title to the property since that time. It was not made to appear that the property was a fair security for this loan. The most that was said by the defendant was, that it was a valuable piece of property; but at the sale under the foreclosure judgment no bid was made for it other than that for which it was purchased. No proceedings were afterwards taken to attempt to collect the deficiency during the lifetime of Squires, who soon afterwards died insolvent. His personal estate, whatever he had, passed to his mother, but no proceedings were taken to collect the deficiency from her, and she finally died leaving this indebtedness unpaid, and that ended, as well as completed, the attention of the defendant to this indebtedness. He charged the costs, as well as the taxes, to the estate, but they were disallowed by the court. And it was justified by his evidence in concluding that the entire indebtedness had been lost through the inattention of the defendant. It was his duty to have taken proceedings at once for the collection of the debt when the mortgagor failed to pay the interest upon it. That, however, he omitted to do, allowing the interest to accumulate for a period of five years, or upwards, before anything was done towards the collection of this debt. If he had acted promptly it is a fair assumption to adopt that the debt might have been saved to the estate, and that his omission so to act was the cause of its loss. And on that presumption he could very well be charged with the loss of this debt. And as much as that, in the way of liability, was conceded by the defendant in his examination as a witness on the trial. The case, as to this fact, contains these questions and answers : " Q. What did you bid ? A. I bought it in at eight thousand dollars. Q. You took the title in your own name ? A. I bought it in and had (it) conveyed to me individually. Q. Did you pay that bid to the estate of Colah in your hands as committee ?

A. No, sir.   Q. Then you admit your liability for that nine thousand and two hundred dollars and interest, I suppose ?   A. Of course." And this, together with the other evidence affecting this mortgage, was very manifestly sufficient to warrant the court in its refusal to deduct the amount of it from the moneys which had passed into the hands of the defendant as the committee of this lunatic.

Another mortgage was made on the 15th of March, 1871, by James T. Pettus, to the defendant, to secure a loan of $20,000. This was upon a leasehold estate situated on the northerly side of Twenty-second street, 100 feet westerly from Fifth avenue, in the city of New York.   The mortgagor had a lease of the property for the period of twenty years, with a privilege of certain renewals. The loan of this sum of money upon this security was entirely inexcusable, for it was a loan, in substance, upon what was no more than an incumbrance placed upon the property, instead of the property itself.   The defendant, in making loans of the moneys of the lunatic, was bound to make them where they were secured by mortgage on real estate, upon the estate itself, subject to no preceding incumbrance, and of a value sufficient to secure the return of the money, beyond doubt or peradventure.   That he failed to do in this instance.   The loan was not upon the estate, but it was upon a leasehold interest, subject at any time to be divested by the failure of the tenant, who was the mortgagor, to pay the rent reserved in the lease. And, as a matter of fact, he was so divested after he had made certain payments upon the indebtedness, leaving a balance of this loan amounting to the sum of $7,333.34 uncollected and unpaid, and which at no time afterwards was, either in part or wholly, paid by the mortgagor.   This was a plain violation of the obligations and duties of a person acting under relations of trust and confidence as those were which had been assumed and accepted by him.   And within the doctrine of *King* v. *Talbot* (40 N. Y., 76), he was liable to reimburse this money to the estate.   Beyond that, by an order made on the 13th of January, 1871, in the Court of Common Pleas, he was permitted only to loan the moneys of the estate upon bond and mortgage on real estate in the city of New York or the bonds of the United States, or of the State of New York, or the stocks or bonds of the city and county of New York.   This order, under the provisions of the Code of Civil Procedure which have already been men-

tioned, as well as the preceding law, the court had the undoubted authority to make, and it was violated by the defendant in loaning the lunatic's money upon this mortgage. And for that violation of his obligations he was plainly liable to reimburse this balance. And that liability was conceded by him upon the trial. For, after stating that the tenant had been dispossessed, he answered other questions propounded to him in the following way: " Q. The property was not worth any more than the rent he had to pay ? A. I do not know what the property was worth. I regarded it as a very valuable piece of property. Q. What examination did you make at the time you loaned the money on it ? A. That which appears in the abstract of title. Q. Let's have that. A. It is among those papers. I have not seen them since I saw them here last. Q. You admit your liability to the estate for what has been lost on that mortgage ? A. Certainly. Q. You do ? A. Certainly. Q. With the exception of what was collected on the principal and what was collected for interest you admit your liability to the estate for the original investment for the Pettus mortgage, with the interest as secured by that mortgage; is not that so ? A. Whether I am liable for the interest, is a question not for me to answer. I admit my liability for the amount of money which I did not receive from the principal." And, from this admission, it follows, of course, that he was equally liable for the lost interest as well as the lost principal. So far, also, he was justly and legally charged by the judgment for the balance remaining unpaid and uncollected upon this mortgage.

It appeared by the proceedings, upon the trial, that a reference was made, on the petition of the defendant, for the adjustment of his accounts and a determination of his right to extra compensation for the services which had been performed by him on behalf of the lunatic, prior to the latter part of the year 1874. The referee, appointed under the application, examined into and reported the state of the defendant's accounts, showing money then in his hands, amounting to the sum of $20,248.38, and securities in bond and mortgage to the sum of $32,833.34. And this statement was ratified and confirmed by the court, with the single addition of $150 added to the amount. And, under the order finally confirming the report of the referee, made in this manner and affirmed on

appeal by the General Term of the Court of Common Pleas, it has been urged that the defendant was relieved from liability for the uncollected indebtedness on each of these mortgages. But that position cannot be supported, for no question arose in the proceeding, as it has been shown, affecting the sufficiency of these mortgages as security for the indebtedness mentioned in them, or the propriety of making either of the loans. What then took place was to ascertain the securities in his hands, not their value or their sufficiency. This question of his liability in no manner appears to have been raised. It was not suggested by himself in his petition, or included in the order of reference, but that simply directed the referee to take and state the accounts of the committee and report upon the amount of compensation which should be allowed to him for his services and commissions. And it was so far, and no farther, that the referee proceeded under this order. That in no respect, and in no manner, involved this question of legal liability. And, in fact, it could not, for the circumstances out of which it has in each instance arisen had not then so matured as to present the question whether the defendant was liable for these losses or not. The proceeding then taken and consummated was, consequently, no bar to the inquiry instituted and followed as to these loans in this action, and the final order of confirmation made upon the referee's report can afford him no protection against this liability.

The court declined to deduct the sum of $5,000, reported by the referee and affirmed by the court to be a fair compensation for the service of the committee up to and including the latter part of the year 1874. It appeared by his accounts that he had appropriated towards the payment of his commissions, up to the latter part of the year 1874, the sum of $6,842.46; and the court charged him with the balance of this amount after deducting the $5,000 reported in his favor by the referee and allowed to him by the Court of Common Pleas. This action of the court has been considered unjustifiable by the counsel representing the defendant on the argument of the appeal; but that he had received these commissions is plainly the effect of his own evidence, given on the trial of the action. As to this fact, his evidence was as follows: "Q. Look at this account and see how much commission you had up to

October, 1874; see if you do not find the item January 1, 1871, $1,173.34? A. That appears here. Q. You did have it? A. Yes, sir. Q. August 1, 1871, $1,139.57? A. Yes, sir. Q. January 1, 1872, $1,121.31? A. Yes, sir. Q. July 1, 1872, $982? A. Yes, sir. Q. January 1, 1873, $830.74? A. Yes, sir. Q. August 1, 1873, $815.98? A. Yes, sir. Q. January 1, 1874, $789.02? A. Yes. Q. You had all those sums? A. Yes, sir; it seems so. Q. Those amount to $6,842.26? A. Yes. Q. Look at the same book, page 22; see if you did not have, July 1, 1874, commissions $760.98? A. Yes. Q. That makes, with that already given, $7,600? A. Yes." As to the latter amount, there was some slight qualification made in further portions of the defendant's testimony, but not reducing the commissions below the sum otherwise conceded and found by the court. The $5,000 allowed to him by the order of the court was, in fact, paid to him. He was asked, when he stated that he did not understand that there had been an over-payment of $2,600, "How do you understand it?" and his answer was, "I did not receive anything more than was allowed. Q. The report was that you ought to have five thousand dollars in all? A. Yes, and I got it."

The court was right in concluding that he had received out of the estate, not only this sum of $5,000 allowed by the order, but the preceding commissions specially mentioned by him and charged to him in his own accounts, amounting to the sum of $6,842.26; and that clearly debarred him from claiming or insisting upon the deduction again of this sum of $5,000. That it was intended to include all the commissions due to him down to the time of the making of the order is evident from his own petition and the report of the referee. What he asked the court for was the sum of $5,000 out of the funds then in his hands, as a just, proper and reasonable allowance to him for his services as committee of the estate to the date of his petition, which was the 3d of October, 1874; and the referee recommended that there should be allowed to him "a sum which, including his commissions, would make the full sum of five thousand dollars." And as this report was, in this respect, confirmed without change by the order of the court, that is all that he could justly claim for services for the lunatic's estate up to the time of the presentment of his petition; and, as he had received that sum

according to his own evidence, he was not at liberty again to charge it against the funds in his hands.

In the investigation before the court it was objected that it should be limited to the transactions of the committee after the order made upon the referee's report near the close of the year 1874. And this objection was well taken, for the reason that to the extent to which the proceedings then went, they were under these provisions of the Code within the exclusive jurisdiction of the Court of Common Pleas. And its order and determination were in the nature of a final judgment passing upon the accounts and adjusting the amounts of cash and securities then in the hands of the defendant. The case of *Tharp* v. *Tharp* (3 Meriv., 510) has been cited as sustaining the right of the plaintiff to extend the inquiry upon the trial back to the time when the defendant received his appointment. But it does not decide in favor of this right where, as in this case, an intervening order has been made by a court of competent, and so far exclusive, jurisdiction. It does determine that in the settlement of the accounts of the committee notice should be given to his next of kin so that they may appear and aid the court in correctly settling and adjusting the accounts, but it does not sustain the proposition that an order of this description may be disregarded and the entire accounting taken over again. Neither does the case of *Blake* v. *Pegram* (101 Mass., 592), for that proceeded upon a statute allowing the accounts of the guardian to be so far opened and re-examined as to correct mistakes in them. And the case of *Douglas's Appeal* (82 Penn., 169) proceeded no farther. Neither these cases, nor either of the others cited, are authorities for opening this preceding accounting. In this State the rule is still less liberal even to an infant, precluding him from such an adjustment as received the sanction of the court in the case cited from Massachusetts. (*Matter of Tilden*, 98 N. Y., 434.) But while this objection should have been sustained by the court no harm in the end was done by overruling it erroneously to the defendant, for it was finally held that the order made in 1874, closing the accounts as they were found to be established at that time, was binding upon the plaintiff, and that the defendant was liable for no more than the money and securities found in his hands at the time when the report of the referee was made. He, accordingly, was not prejudiced by the ruling of the

court allowing the preceding accounts to be again investigated or by the circumstance that the principal of the estate itself had, in the period of four years, been reduced from the aggregate amount of over $104,000 to the sum of $53,081.72. In this investigation, as well as by other evidence, it appeared that a committee of the person of this lunatic had also been appointed and that large amounts had been paid to him by the defendant under the orders of the Court of Common Pleas. But as the court had complete jurisdiction to make such orders, and they were made after the hearing of counsel, they could not be opened or their propriety considered or passed upon in this action, and that was so determined and held by the court. It was, undoubtedly, unfortunate for the estate that the custody of the lunatic should have been committed to the control of another person, but that was done in the exercise of the discretion of the court, presuming it to be for the best interests of the lunatic himself, as the fact then probably appeared. But certainly it would be more in accord with the protection of unfortunates of this description, that the number of persons to whom their property and their rights shall be committed shall be reduced as far as the circumstances will properly permit that to be done. These, however, are circumstances which have been disposed of by the judgment entered in the action in no manner increasing the extent of the defendant's liability beyond that appearing by the report of the referee adjusting the accounts in the year 1874. To this extent his liability has been well supported by the evidence taken during the trial. And no ground appears from an examination of the case or the arguments adduced in support of the appeal which will justify any change in the principal sums charged against the defendant.

In arriving at the amount for which the judgment should be allowed, the defendant has been charged with the legal rates of interest added to the principal at the close of each year after the year 1874. This was done because of his omission to invest the funds in securities, as that was directed by the order made in January, 1871, and as it was the clear obligation of the defendant to invest them without any order under the law of the State applicable to the case. The lunatic was returned to his own country under an order of the court made in 1871. After that a committee

of his estate was appointed by a court alleged to have jurisdiction over the subject in Bombay, and an application was made to transfer the estate from the defendant to that place. This was opposed on behalf of the defendant, and it resulted in a decision of the Court of Common Pleas declining to make the transfer upon the understanding that the estate was all at that time carefully invested in bonds and mortgages at an annual rate of interest of seven per cent. (*Matter of Colah*, 6 Daly, 308, 317, 318.) But, as a matter of fact, at that time the estate was not so invested, and never had been wholly invested in that manner. This decision was made in 1875; and upon this subject the defendant was asked: " Q. You just said the last mortgage was paid off was paid in November, 1875 ? A. Then it was not invested. Q. There was not a dollar of it invested ? A. No, it seems not." Instead of the estate being invested as it was assumed to be by this decision, the investments on bonds and mortgages were the two which have already been mentioned. There was a clear misapprehension on the part of the court as to the condition in which this estate was at the time under the control of the defendant. And under that misapprehension, apparently, it was that it was deemed best not to transfer it to Bombay, but to retain the control of it in the hands of the defendant as being more serviceable than it probably could be by sending it to another country. Instead of being invested upon bond and mortgage, or in any other manner, the estate, so far as any account of it has been given, was on deposit in the hands of Vermilye & Co., who allowed but a small rate of interest upon it, and it continued in this manner without investment, to the time of the decease of the lunatic. The interest returned upon it has not been certainly stated in the evidence. In one part of his testimony it has been mentioned by the defendant as two or three per cent, and in another four per cent. The returns of interest, however, as they appeared in the accounts produced, were very small, when, if the funds had been invested as the order required them to be, sufficient moneys would probably have been derived from them to support, or nearly support, the lunatic and his family. The defendant, in his testimony, excused the omission to invest the funds on bond and mortgage, by the depression in business and property-values from about the year 1873. But such depressions, ordinarily, do not create an inability

to make loans, or to make them on safe security at fair rates of interest. And the court, for that reason, was not required to accept this excuse as it was given by the defendant in his evidence. As against the interested party in the case, it was still entitled to judge what weight and effect should be given to these statements, and the extent to which they should be allowed to relieve him from liability. (*Becker* v. *Koch*, 104 N. Y., 395.) They were not considered sufficient for that purpose, and because of the failure of the defendant to invest the moneys in his hands, he has been charged by the court with the legal rates of interest added to the principal at the expiration of each year. The correctness of this charge is resisted on behalf of the defendant, and the objection which has been urged to it is supported by the authorities. It was not shown in the course of the trial, neither has the fact been found by the court, that there was any willful misappropriation of the moneys of the estate, or willful neglect to invest them as it was the duty of the defendant to do. What the evidence establishes, and the court has found as the facts proven by it, is, that he failed and omitted to make the investments as he should have done, and mingled large portions of the estate with his own funds so as to render him unable to account for the amounts. But from the decision of the court it is evident that if the judgment herein is collected the estate has lost, or will lose, or been deprived of no part of the principal to which it is entitled. That is all included in the recovery provided for by the judgment entered upon the authority of the decision. And where that is the case it has not been the practice of the courts to charge a trustee, which the defendant, in a general sense, was, with more than the legal rate of interest.

In *King* v. *Talbot* (*supra*), compound interest was added under the peculiar circumstance of that case. But where there has been no more than a neglect of duty on the part of the defendant, it has been considered to be sufficient to charge him with simple interest. And that was the conclusion of the court in *Thorn* v. *Garner* (42 Hun, 515); and in *Livermore* v. *Wakeman* (25 id., 341), the rate was limited to what the plaintiff might have obtained by the deposit of the money with the trust company where it was his duty to have placed it. In *McKim* v. *Blake* (139 Mass., 593), the

trustee had sold securities and converted the proceeds to his own use, and yet he was charged with no more than simple interest. And the court declined to go even as far as that in *Wilmerding* v. *McKesson* (103 N. Y., 329), although the trustee had invested the trust funds in business which he had no right to do. The general rule, however, sustained by the authorities, is to charge the trustee with simple interest for neglect on his part to invest the funds as it is his duty to do it under his appointment. (1 Perry on Trusts [2d ed.], § 468, and cases there referred to; *Matter of Thurston,* 57 Wis., 104.) What the court under these authorities should have done was to charge the defendant with simple interest upon the moneys from time to time, annually, remaining in his hands. This will include interest at the rate of seven per cent to the 1st of January, 1880, and at the rate of six per cent from that time to the recovery of the judgment. (*O'Brien* v. *Young,* 95 N. Y., 428; *Ball* v. *Biddlecom,* id., 651.) And to that extent he should be charged, because of the large reduction which has taken place in the principal of this estate while it has been subject to his administration. It is plain to see, if the amount received by him of $104,000 had been invested, even at a lower rate of interest than that mentioned in the order, and permission so to invest it might have been obtained, if that had been necessary, or than has been provided by the act of 1879, from the 1st of January, 1880, that the estate would have yielded a sufficient sum of money to have supported the lunatic and his family, consisting of his wife and two children, and allowed the principal to be paid to his personal representative after his decease, entirely intact. Discreet and prudent management would probably have supported them well out of the income of the property, even if it had been invested at four and a-half or five per cent. And that would have preserved the entire principal for the benefit of the lunatic's family. It was the defendant's duty to resist every improper encroachment upon the funds in his hands, instead of which, they were depleted, from time to time, by orders, which would not have been made if they had been reasonably resisted, and the facts affecting their propriety brought to the attention of the court, as it was the duty of the committee to present them. Under these circumstances, no less a rate of interest than that already mentioned will

answer the purposes of justice between these parties. In this respect the judgment should be modified, requiring the computation of interest to proceed without annual rests or additions to the balance in the defendant's hands, but to charge him with the legal rate of interest of seven per cent, to January 1880, and at the rate of six per cent since that time, and the additional allowance should be correspondingly reduced, without costs.

The appeal, from the order denying the motion to resettle the case is without any foundation whatever, for, by the case as it has been settled, the matter proposed to be added to it is already contained in it. And, if it was not, it could make no difference whatever in the determination of the appeal from the judgment. As to this appeal, the order should be affirmed, with ten dollars costs, and also disbursements.

Bartlett, J., concurred.

Van Brunt, P. J. :

I cannot agree with Mr. Justice Daniels as to two of the conclusions at which he has arrived in the opinion written by him, namely : That the Supreme Court had jurisdiction to call to account a servant and officer of the Court of Common Pleas for a trust reposed in him by that court ; and, secondly, that the Supreme Court had power to amend, revise and correct the judgment of the Court of Common Pleas rendered upon the passing of the accounts of the defendant as committee, on the 15th of December, 1874.

The ground upon which this jurisdiction is sought to be upheld, is that the Supreme Court has become the successor of the jurisdiction of the Court of Chancery, which court had jurisdiction of most of the proceedings of a committee appointed to take care of the estate of a lunatic. Attention is called to the fact that the committee of a lunatic was not appointed by the Court of Chancery but by the chancellor, and the authority and jurisdiction which the Court of Chancery exercised over a committee thus appointed arose not from any power conferred by statute, but because of the general jurisdiction which said court exercised over trustees. But it seems to me that due regard has not been given to the fact that the jurisdiction of the Court of Chancery has not descended solely upon the Supreme Court, but that such jurisdiction was at the time of the

abolition of the Court of Chancery, and since that time, has been conferred upon other courts which exercise chancery jurisdiction concurrently with the Supreme Court. There seems, also, to be over-looked another change in the legislation affecting the custody and control of the persons and estates of lunatics.

Prior to the abolition of the Court of Chancery the power to appoint a committee of the person or estate of a lunatic was vested in the chancellor as an individual, and not as the head of the Court of Chancery; and therefore the power to appoint a committee of the person and estate of a lunatic, by the establishment of the Supreme Court as a court of general equity jurisdiction, was not thereby conferred upon that court; and unless there had been a complete change in the scope and method of the appointment of such committees, the Supreme Court, as a court of general equity jurisdiction, would have been entirely without jurisdiction to appoint a committee of a lunatic, although it may be the successor of the Court of Chancery. But, upon the abolition of the Court of Chancery, the powers and duties, not only of the Court of Chancery, but of the chancellor, devolved upon the Supreme Court, as such, and the care and custody of the persons and estates of lunatics was conferred upon the Supreme Court, and not upon any individual member composing that court. In the Court of Chancery it was the chancellor personally that made the appointment. Subsequent to the abolition of that court, it was the Supreme Court which made the appointment, and it was that court which had jurisdiction over the committee as trustee of the estate.

Up to this time, perhaps, and prior to the enactment of the Code of 1848, the Court of Common Pleas had no jurisdiction of the estates either of lunatics or drunkards. But by the Code of 1848 (§ 30) it was provided that County Courts should have jurisdiction in all actions and proceedings for the care and custody of the person and estate of a person of unsound mind or an habitual drunkard residing in the county, thus conferring upon these courts co-extensive and concurrent jurisdiction with the Supreme Court upon these subjects. In order to remove any doubt as to the jurisdiction of the Court of Common Pleas, an act was passed in 1854 by which power and jurisdiction were conferred upon the Court of Common Pleas to exercise in the city of New York all the powers and jurisdiction

now or thereafter conferred upon or vested in the said court or the County Courts in other counties, and the jurisdiction which was vested in the Court of Common Pleas of the city and county of New York before the enactment designated as the Code of Procedure, passed April 12, 1848. By this legislation the care and custody of the estates and persons of lunatics was conferred upon the Court of Common Pleas to precisely the same extent that it had been conferred by the Revised Statutes upon the chancellor and the Court of Chancery and by the judiciary act upon the Supreme Court as their successor. It is, therefore, apparent that the jurisdiction over the committees appointed by reason of this power conferred upon both the Supreme Court and the Court of Common Pleas does not arise from any equity jurisdiction possessed by either of those courts, but springs out of the fact that they have jurisdiction conferred upon them by statute in all actions and proceedings for the care and custody of the persons and estates of persons of unsound mind or habitual drunkards.

It is necessary, next, to consider the relation of the committee of the estate of the lunatic to the court appointing him. It has been stated by the learned counsel for the respondent that " it is true that the Court of Common Pleas has repeatedly decided in the present case that the committee of a lunatic is an officer of the court appointing him. No other court has ever so decided, and such decision was never made except in this case." He then proceeds to state that such decision was made by that court for some ulterior purpose.

It would appear, upon an examination of the cases, that the Court of Common Pleas had not only quite ancient, but also very respectable authority for calling the committee appointed by it its officer or servant. As long ago as the year 1861 it was held by the General Term of the Supreme Court, *In the Matter of Clapp* (20 How. Pr., 385), that upon the return of a commission of lunacy, with the inquisition annexed, finding the alleged lunatic of unsound mind, the court became invested with the control and care of his property, and was authorized to appoint a committee to take charge thereof; and the committee, after such appointment, was intrusted with such property as officers of the court. And in 1882 this decision was approved by the Court of Appeals, *In the Matter of Beckwith* (87 N. Y., 503), and in which case the court further held

that the place of a committee vacated by death could only be filled by the court which appointed him, and whose servant and bailiff he was; holding, also, that the sections of the present Code regulated the proceedings in that matter, although the committees had been appointed in 1855. These adjudications seem to have furnished ample authority for the Court of Common Pleas styling the person whom it had appointed its officer or servant. These cases further establish the proposition that, by the appointment of the committee of the lunatic the care and custody of the lunatic his estate became vested in that court. It is expressly so stated in the case of Clapp, above referred to, and also in the *Matter of Beckwith*, in which latter case the court say: "The care and custody of the lunatic and his estate was vested in the Supreme Court (and became so vested by the appointment of the committee) and whether any, and if any, what costs and disbursements should be allowed to him or an attorney acting in his behalf, upon an unsuccessful effort to take the lunatic and his property from its keeping, presented a question to be determined in its discretion and according to its estimate of the character of the application and the conduct of the party." This would seem to be an express recognition of the right of the court appointing the committee to exercise its control over the estate, and that all questions in regard to the administration of the trust were entirely within its jurisdiction. If the care and custody of the lunatic and his estate were vested in the Supreme Court, in the case cited, because of the appointment of the committee, and such court had the right to determine, in its discretion, what costs and disbursements should be allowed to the committee or an attorney acting in his behalf, then, certainly, it had the power, and it only had the power to determine whether the trust had been properly and completely administered. And, further, if the care and custody of the estate is vested in the court making the appointment of the committee, and the estate is in the hands of that court, and it can exercise its discretion as to the costs and disbursements which should be allowed to its officer or servants, by what authority can any other court of simply equal jurisdiction exercise the discretion which is vested in the court making the appointment, and divest that court which had first acquired jurisdiction and possession of the estate, by means of its committee, of such custody and control?

But it may be said that by the death of the lunatic, under the provisions of section 2344 of the Code and of the Revised Statutes before the Code, the power of the committee ceases and the property of the decedent must be administered and disposed of as if a committee had not been appointed, and that this deprived the court of its exclusive jurisdiction. In the case of Beckwith, above cited, the Court of Appeals plainly intimate that such cannot be the case. They there state that although upon the death of the lunatic the powers and functions of the committee ceased, the court might, perhaps, before passing over the property to the administrator of the lunatic, have made provision for the expenses incurred while the estate was under its supervision, a clear recognition of the fact that the estate is in the court where it had been vested by the proceedings which resulted in the appointment of the committee, and that the *court* passes over the property to the administrator.

Under the statute, section 2343 of the Code of Civil Procedure, when the lunatic becomes competent to manage his own affairs, and it is so adjudicated, and hence the power of the committee ceases, he cannot reclaim his property from the committee's hands without the intervention of the court making the appointment, as the form of procedure in such a case is prescribed by the section referred to, which is that such court must require the committee to restore to the former lunatic his property. So when the lunatic dies the power of the committee ceases, but his liability as such continues and he is not discharged until the court appointing him has ordered such discharge in the same manner as is provided in the last section quoted. This function of discharging a committee is vested in the court appointing him and can only be exercised after such court has ascertained that the trust has been faithfully performed according to its directions. Under this condition of the law, the defendant being plainly the servant and officer of the Court of Common Pleas, if the defendant, under and by direction of the Supreme Court, in an action for the passage of his accounts, should pay over the trust fund, it is clear that he would still be amenable to the Court of Common Pleas, and that that court might call him again to an account, and that the proceedings in the Supreme Court would be no bar, because such proceedings would be absolutely without jurisdiction.

It is difficult to understand where a trust is vested in a particular court having jurisdiction of the subject-matter, that another court may intervene and deprive it of that jurisdiction without some express legislative authority. The books are full of cases that where courts have concurrent jurisdiction, and a proceeding is initiated in one, such proceeding is held to be a bar against the commencement of another in a different court. But, in answer to this proposition, it is urged that this argument would be just as effective if applied to the case of an executor or guardian who may account before the surrogate, or the case of a voluntary assignee who might account before the Court of Common Pleas, in each case being directed thereto under certain specific laws in their behalf. And reference is made to the fact that the Supreme Court has jurisdiction in an equity action to compel these persons to an accounting and payment over of the assets. The first distinction between these cases and the one at bar is that neither the executor nor the guardian nor the assignee is the servant or officer of either the surrogate or of any judge of the Court of Common Pleas; and that the care and custody of the estate which they administer are not vested either in the surrogate or in the Court of Common Pleas. Certain summary statutory powers have been conferred upon the surrogate in the case of executors and guardians and upon the judges of the Court of Common Pleas, as such, and not upon the court, in respect to assignees; but it is only the conferring of summary jurisdiction upon those individuals over those trustees in the management of their trust estates, and the Supreme Court, by reason of its general equity jurisdiction, and the Court of Common Pleas as well, within certain territorial limits, has the same authority over such trustees as the Court of Chancery always exercised in those cases in which the chancellor made the appointment. And even in the cases cited where proceedings had been commenced either before the surrogate or before one of the judges of the Court of Common Pleas upon any subject-matter connected with those various trusts of which they had jurisdiction, the existence of those proceedings would be an answer in any action brought in the Supreme Court or Court of Common Pleas to obtain the same relief. This consideration disposes of the objection that by holding that the Court of Common Pleas became vested with the care and custody of the estate of the lunatic by

reason of the initiation of these proceedings, and has the exclusive right to control its own officer and servant, thereby the Supreme Court is deprived of some its constitutional rights. It is true that the Supreme Court is a court of general jurisdiction in law and equity. It is also true that the legislature cannot deprive the Supreme Court of such jurisdiction. But the rule has been, since the existence of courts of concurrent jurisdiction, that where two or more courts possess jurisdiction over a given subject that that court which shall first acquire the same shall have jurisdiction exclusively. This is not depriving any court of any part of its jurisdiction, but is simply regulating methods of procedure, and this right has been recognized too frequently to need the citation of authorities here.

It is further suggested that the committee of a lunatic is no more the officer of the court than is the guardian of an infant, and reference is made to the fact that the security to be given by the committee is similar to that given by the guardian of an infant appointed by the Surrogate's Court; and that the condition of the bond provides that he will, in all respects, render a just and true account of all money and other property received by him and of the application thereof, and of his guardianship whenever required to do so by a court of competent jurisdiction.

It seems to me that it would be carrying the doctrine of legislation by implication to an extent never before known to hold that, because of the introduction of those words in the bond of a committee, therefore, any court of equitable jurisdiction has power to call him to an account. The origin of those words, when we consider the jurisdiction which the surrogate originally had, is very apparent. The surrogate, by the revised laws, had authority only to appoint a guardian. He had no power to remove him or to call him to account, and whatever authority was conferred upon surrogates to remove guardians or to direct and control their conduct and settle their accounts seems to have been first conferred by the Revised Statutes. Prior to that time he had no general jurisdiction over a guardian as trustee. This jurisdiction was solely exercised and to be exercised by the Court of Chancery having the same jurisdiction over statutory or testamentary guardians as it had over guardians *in socage.* It was, therefore, necessary that the guardian should be required to

account before some court having cognizance of the subject. And so at the present time, although the jurisdiction of the surrogate has been extended so that he has the power to call upon the guardian to account, yet such jurisdiction is not exclusive, and, upon a proper proceeding brought for the purpose, such guardian may be called upon to account by the Supreme Court.

In respect to a committee, the court appointing him, having become vested with the person and estate of the lunatic by virtue of such appointment, it is the only court of competent jurisdiction which may call him to an account, and the condition of the bond is entirely harmonious with the legal rights conferred.

It has been already stated, in considering the decision of the Court of Appeals in the *Matter of Beckwith*, that it is held by that court that the care and custody of the lunatic and his estate were vested in the Supreme Court, by virtue of its appointment of a committee, and that whether any, and if any, what costs and disbursements should be allowed to the committee was a question to be determined, in its discretion, according to its estimate of the character of the application and the conduct of the party. Upon the settlement of the accounts of the committee, how is another court to exercise this jurisdiction which has been vested in the court making the appointment?

But it is urged that the lunatic having died and the powers of the committee having ceased, therefore all authority over the estate is terminated, and the persons entitled thereto may appeal to any jurisdiction for the purpose of enforcing their rights. In this assertion the fact that the property is in the custody of the court appointing the committee, and that that court must act in order to turn over the property to the administrators of the deceased lunatic seems to be entirely overlooked.

The fact that the property remains in the custody of the court and under its control, and is to be passed over under its direction, is expressly recognized by the decision in the case of Beckwith, in which the court say that the court may perhaps, before passing over the property to the administrator of the lunatic, have made provision for expenses incurred while the estate was under its supervision. Here it is expressly recognized that the estate is in the hands of the court making the appointment, that it has been all the time under its super-

vision, and that that court is to pass over the property to the administrator of the lunatic, and that in passing over the estate the court may make provision for the expenses incurred while the estate was under its supervision.

It had been previously stated in that opinion that those expenses were within the discretion of the court appointing the committee. How then, I repeat, can this discretion be exercised by another court? In fact, the whole course of decision upon this question shows that the court acquiring jurisdiction by the appointment of the committee has control of the estate, and that it is that court which must pass it over to the administrator; and that no other court can interfere with the administration of the estate and with the committee appointed. It is precisely in the same condition as in the case of a receiver who is an officer of the court and over whom no other court has any jurisdiction whatever. Conceding that an action may be maintained by the legal representatives of a deceased lunatic against a former committee, in a court other than that appointing him, as a person having in his hands property to which such legal representatives have title, by reason of their successorship to the deceased lunatic, such action must be against such former committee as an individual having property of the deceased in his hands, to which such legal representatives are entitled, and cannot be maintained against him as committee, because, as committee, he is only amenable to the court of his appointment, whose officer and servant he is. In such an action a recovery could only be had for the property which the former committee has actually in his possession. The claim that he ought to have had more, cannot there be litigated, because, being the officer and servant of the court appointing him, he is only answerable to that court for the manner in which he has performed his duties, and it is for such court, and such court only (certainly in the first instance), to determine whether its officer and servant has been derelict in his duty, and should have realized more from the trust fund than he has done. In the case of Beckwith, it is expressly held that the amount which should be allowed to the committee for expenses of administration presents, in these cases, a question to be determined by the court appointing such committee, in its discretion and according to its estimate of the character of the services rendered, and

that, in the case of the decease of a lunatic, such expenses may be provided for before passing over the property to the personal representative of the deceased lunatic. If this is the case, how can another court usurp these functions and exercise this discretion? In the case at bar, Mr. Jarvis, being the officer and servant of the Court of Common Pleas, in which court the custody of the estate of the lunatic has become vested, what other court can determine the questions as to what expenses should be allowed, a matter within the sound discretion of that court alone, as we have seen, and, as to whether he was derelict in his duty in not keeping the estate more closely invested, and that he should, therefore, be chargeable with interest which has not been earned, or that he had forfeited his claim for commissions because he had not performed his duties faithfully as an officer of the Court of Common Pleas. If the Supreme Court has jurisdiction to consider these questions, such court might be of opinion that he should not be allowed certain expenses for which the Court of Common Pleas might be of opinion that, under the circumstances of the case, he should be allowed, and we would have the anomalous condition ·of affairs that the Supreme Court would be deciding the question as to whether or not the officer and servant of the Common Pleas had performed his duties to the satisfaction of the latter court, and exercising the discretion which is lodged solely in the Court of Common Pleas, as to expenses which were to be allowed to its officer and servant. I have considered this question entirely independent of the provisions of the Code, as it does not seem to me that the Code has added anything to the law as it existed prior to its enactment.

The provisions of the Code (§ 2320) are that where various courts have jurisdiction of these matters, namely, the custody of the property of a person incompetent to manage himself or his affairs in consequence of lunacy, idiocy or habitual drunkenness, the jurisdiction of the court first exercising it as therein described is exclusive of that of the others with respect to any matter within its jurisdiction. Section 2322 provides that the jurisdiction must be exercised by a committee of the person or of the property. And section 2339 provides that a committee, either of the person or the property, is subject to the direction and control of the court appointing him; and that he may

be suspended, removed or made to resign in the discretion of the court, and that a vacancy created by death, removal or resignation may be filled by the court. By this section is committed to the court making the appointment the absolute control and direction of the committee with respect to the execution of his duties, and that this is a subject-matter which must necessarily arise in the accounting of every committee is so apparent that it does not need discussion for the purpose of its elucidation. This is one of the matters for which provision is made in the Code, and it is, therefore, one of the matters of which the court appointing the committee has exclusive jurisdiction.

Section 2342 seems also to recognize the fact that only the court making the appointment may take cognizance of the accounting. If the appointment is made by the Supreme Court it directs the county judge of the county where the order appointing him is entered to examine or cause to be examined, under his direction, all accounts and inventories filed by the committee of the property since the first of February in the preceding year. If it appears, upon examination, that the committee has failed to file his annual inventory and account, or if the judge is of opinion that the interest of the person for whom the committee was appointed requires that he render a more full or satisfactory account, he may make an order requiring the committee to supply the deficiency, and that is all. He cannot proceed to examine the account for the purpose of passing upon the same, so far as it may discharge the committee or charge the committee. All that he can do is to compel the committee to file an account, and if it be not satisfactory, to file an additional account ; and if the additional one is not satisfactory, or if the committee fails to comply with the order and the judge has reason to believe that sufficient cause exists for the removal of the committee, he may appoint a fit person to be special guardian for the purpose of filing a petition in his behalf for the removal of the committee and prosecuting the necessary proceedings, these proceedings necessarily to be prosecuted in the court appointing the committee. If it had been intended to confer general jurisdiction upon other courts to assume control of the proceedings of a committee, certainly it would have been conferred in the section referred to upon the county judge, or the presiding judge of the court by

whom the committee was appointed. But it is clearly not intended to confer any such authority, but the authority was intended to vest and exist only in the court which has made the appointment of the committee. The application for the removal of the committee must necessarily be made to the court which makes the appointment, because the Code expressly provides that the removal shall be made by such court. And the fact that it can only be made by such court is recognized by the Court of Appeals in the case of Beckwith, already cited. This general jurisdiction to call a committee to account, if it exists at all, exists during the lifetime of the committee as well as upon his death, as such; and as none but the court appointing him can remove him or give directions as to the administration of the trusts, the court assuming jurisdiction of a committee appointed by another court to call him to account, would be powerless to remove him, no matter what derelictions the committee had committed, nor give any directions as to the administration of the trust, a condition of helplessness in which no court of equity has ever before found itself in respect to any trustee over whom it has jurisdiction.

It is urged that jurisdiction is expressly excluded in the exigencies of the present case, as no provision is made or method suggested for the recovery by the heirs, upon the death of the lunatic, of the property remaining in his hands. If the lunatic recover, the court orders it turned over, and if the lunatic die, the power of the committee ceases and the property of the deceased must be administered as if a committee had not been appointed. This objection assumes that the custody and control of the property of the lunatic has been vested in the committee. Upon the contrary, as we have seen, the control of the property of the lunatic has been vested in the court which appointed the committee, and the committee is simply the servant and officer of that court, and has no right whatever to turn over the property to anybody except such person as may be designated by the court making the appointment. In fact, the property is deemed to be in the custody of the court all the time; the committee is its mere agent and servant for the administration of the same, and when the property is passed over to the administrator of the deceased estate it is passed over by the court which holds it and which made the original appointment of the committee.

As already said, when it is once established, as it has been, both upon principle and by the adjudications to which reference has been made, that the property of the lunatic is in the custody of the court and that the committee is its mere agent for the administration of this property, then it necessarily follows that no other court, under any circumstances, can interfere with that administration and deprive the court which made the appointment of that custody, any more than it could interfere with the custody of property in the hands of a receiver appointed by another court. I am, therefore, of the opinion that the Supreme Court had no jurisdiction to entertain the action calling the committee to account in that court, appointed as he was by the Court of Common Pleas. It is conceded that the Court of Common Pleas had jurisdiction to call the committee to an account and to pass such account, and that its directions in regard to the disbursement of the funds committed to its care were binding upon the Supreme Court in this action; and yet, by the judgment in this case, the judgment of the Court of Common Pleas upon the accounting is impeached and corrections attempted to be made therein, because, in the opinion of this court, the evidence before the Court of Common Pleas did not justify the conclusions to which it arrived.

In the accounting before the Court of Common Pleas there was an express adjudication as to the amount of money in the hands of the committee at the time of such accounting, and it is thereby adjudged that, over and above his credits as commissions, the defendant had in his custody $53,231.72 in money and securities, and that he was entitled to a compensation of $5,000 for his services as committee up to this time, $1,801.21 being the amount of his commissions which had been deducted by the referee from the amount with which the committee was charged, and the remaining sum of $3,198.79, making up the $5,000, the committee had a right under the order of the court to draw, leaving in his hands the sum of $50,032.93. Notwithstanding this adjudication the learned court below, because, in its judgment, the evidence which had been attached to the report of the referee did not justify this conclusion, proceeded to correct this account, and instead of the committee being charged with $50,032.93, the amount found by this judgment to be in his hands, he is charged with the sum of $55,074.18. I cannot conceive how this court has any authority whatever to

impeach this judgment upon any ground.   If any mistake had been made in the judgment it was for the Court of Common Pleas to correct it.   The Court of Common Pleas had jurisdiction of the committee, of his accounts, of his method of executing the trust and of the allowances which should be made to him for his expenses in the execution of the trust, and had adjudicated upon that subject up to a given time.   This court cannot revise or modify that decision or that judgment.   It may think it erroneous.   It may think that it proceeds upon a false basis ; or it may think that the conclusions were not deducible from the evidence ; but those considerations give this court no authority to review or amend the judgment pronounced by that court years ago.   The assumption of this authority certainly reverses all the rules which have governed the conclusiveness of judgments of courts of competent jurisdiction.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide event.

Judgment modified, and as modified affirmed, without costs.

Order affirmed. with costs.